IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DIANE W. SIRON,

      Plaintiff,

v.                                  CASE NO. 1:12-cv-05-MP-GRJ

MICHAEL J ASTRUE, Commissioner
of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability benefits and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. (Doc. 1).   The Commissioner has answered (Doc. 6), and both parties have filed briefs outlining their respective positions. (Docs. 11 & 12).  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed her applications for disability and supplemental income benefits on April 17, 2007, alleging a disability onset date of January 1, 1998 due to COPD, asthma, and emphysema.  (R. 117-24, 145.)  The ALJ found that she had the severe impairments of anxiety related disorder, depression, borderline intellectual functioning, osteoarthritis, obesity, and arthritis.  (R. 48.)  Plaintiff was born in 1956 and was 53 years old at the time of her hearing.  She attended school through the ninth grade and previously worked as a cashier, certified nursing assistant, cook, sewing machine

operator, and desk clerk.  (R. 15, 51.)

Plaintiff's applications were denied initially and upon reconsideration.  (R. 62-67, 70-73.)  An administrative law judge (ALJ) conducted a hearing on December 8, 2009 and entered an unfavorable decision on April 1, 2010. (R. 46-56.)  The Appeals Council denied Plaintiff's request for review on November 15, 2011.  (R. 1-5.)  Plaintiff filed the Complaint in this case on January 11, 2012.  (Doc. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from

However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

---

evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(l), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

disabled.[11]   Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled.[12]   Fifth, if a claimant's impairments (considering his

residual functional capacity ("RFC"), age, education, and past work) prevent him from

doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[14]   The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[15]   The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

---

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The
Commissioner must produce evidence that there is other work available in significant
numbers in the national economy that the claimant has the capacity to perform.  In order
to be considered disabled, the claimant must then prove that he is unable to perform the
jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner
was initiated by the courts, and is not specifically provided for in the statutes or
regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the
Commissioner to show that the claimant can perform other work.").

exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

Because Plaintiff's challenge on appeal pertains only to her mental impairments, the summary of the record is limited to evidence relevant to those impairments.

### A.  Medical Evidence

As the ALJ's step two finding reflects, Plaintiff suffers from the severe impairments of anxiety related disorder, depression, borderline intellectual functioning, osteoarthritis, obesity, and arthritis.  (R. 48.)  Carmen Tozzo-Julian, Ph.D., evaluated

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

Plaintiff on February 15, 2008 and again on March 2, 2010.  (R. 389-92, 481-89.)  After

the first consultative exam, Dr. Tozzo-Julian noted that Plaintiff's mental status

indicated that attention and memory functions were moderately impaired, but the

deficits were likely due to chronic pain, depression, and anxiety.  Dr. Tozzo-Julian

diagnosed depression, and post traumatic stress disorder.  (R. 389-92.)

    At Plaintiff's second consultative exam with Dr. Tozzo-Julian on March 2, 2010,

several psychological tests were administered.  On the Wechsler Adult Intelligence

Scale-IV, Plaintiff's results were 68 in verbal comprehension, 73 in perceptual

reasoning, 58 in working memory, 59 in processing speed, and 59 full-scale IQ.  Dr.

Tozzo-Julian noted that given Plaintiff's history of learning disabilities, the perceptual

reasoning index score (73) was the best measure of Plaintiff's intelligence.  She

diagnosed Plaintiff with major depression, post traumatic stress disorder, panic

disorder, and borderline intellectual functioning.  (R. 481-89.)  Dr. Tozzo-Julian also

completed a questionnaire in March 2010 which indicated that Plaintiff had moderate

impairments in most areas, with no limits on her ability to understand, remember, or

carry out simple instructions and mild limitations in her ability to make judgements on

simple work-related decisions.  Dr. Tozzo-Julian noted that Plaintiff's "mental status and

intellectual testing indicated moderate attentional deficits."  (R. 487-88.)

    Other relevant psychological evidence includes a psychiatric review technique by

state agency physician Nancy Dinwoodie, M.D., in February 2008 and a mental

impairment questionnaire by Plaintiff's primary care doctor, Antonio D. Farrales, M.D.,

in April 2008.  (R. 393-406, 433-436.)  Dr. Dinwoodie opined that Plaintiff had mild

functional difficulties and no episodes of decompensation, and that these functional

limits were due primarily to Plaintiff's physical problems.  (R. 393-406.)  Dr. Farrales did

not complete the DSM-IV multiaxial evaluation portion of the form but opined that

Plaintiff did not have a low IQ or reduced intellectual functioning, had mostly moderate

functional limitations, and had anxiety and a complete inability to function independently

outside the home.  (R. 433-36.)

**B.     Hearing Testimony**

At her administrative hearing on December 8, 2009, Plaintiff was 53 years old.

She testified that she went to school through the ninth grade and stopped working in

1998 due to an illness.  Her most recent job was as a desk clerk at a feed store but was

let go when they found out she "didn't have an education."  Prior to that she worked

sewing furniture covers and as a nursing assistant.  Plaintiff testified that her pets are

her hobby and that she used to go to church but does not now because of anxiety.  She

lives with her husband and occasionally does the grocery shopping.  She has a driver's

license and drives occasionally.  She also cooks and does some of the household

chores.  (R. 11-34.)

**C.     Findings of the ALJ**

The ALJ found that the Plaintiff had the residual functional capacity to perform  a

wide range of light work with additional restrictions and was capable of performing her

past relevant work as a counter supply worker.  (R. 51, 54.)  The ALJ specifically

explained that Plaintiff did not meet Listing 12.05B for mental retardation because she

did not have the requisite valid IQ score, as evidenced by the examining psychologists's

conclusion that Plaintiff had borderline intellectual functioning, not mental retardation. As to Listing 12.05C, the ALJ again concluded that Plaintiff did not have the requisite IQ score.  (R. 51.)

## IV.  Discussion

Plaintiff argues that the ALJ erred at step three by not finding that she met the requirements of Listing 12.05B or 12.05C for mental retardation due to her low IQ score and additional severe impairments.  (Doc. 11.)  However, Plaintiff does  not have the requisite adaptive deficits or IQ scores to meet the requirements of the listing and therefore the ALJ's decision is due to be affirmed.

The listing for mental retardation in Listing 12.05 requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[21]  The diagnostic description states that an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[22]  Subaverage general intellectual functioning refers to an

---

[21]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

[22]  Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

IQ of about 70 or below on various standardized intelligence tests.[23]   Listing 12.05B

requires that the claimant also have a "valid verbal, performance, or full scale IQ of 59

or less."  Listing 12.05C requires that the claimant also have a "valid verbal,

performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental

impairment imposing an additional and significant work-related limitation or function."[24]

With regard to the diagnostic description requirements of Listings 12.05 B and

12.05C, the evidence does not demonstrate that Plaintiff has the requisite adaptive

deficits nor does the evidence demonstrate that the Plaintiff had subaverage intellectual

functioning, which manifested before she was 22 years old.  Plaintiff reported in a

disability report that she completed tenth grade and attended special education classes.

(R. 149-50.)  At the hearing, she testified that she completed the ninth grade.  (R. 15.)

She told Dr. Tozzo-Julian that she completed the ninth grade but left in the middle of

the tenth grade to have her first child.  She also married her first husband around this

time.  (R. 389.)  Though she did not go on to earn her GED, Plaintiff did obtain training

as a CNA.  (R. 389, 482.)  There is scarce evidence to support a finding that Plaintiff

manifested subaverage intellectual functioning during the development period, as

required by the introductory paragraph.

With regard to Plaintiff's IQ scores, her full-scale IQ score was 59 (fitting the

criteria of 12.05B) and she had a verbal IQ score of 68 (fitting the IQ criteria of 12.05C).

However, these scores are problematic because: (1) they were not obtained when she

---

[23] <u>DSM-IV</u> at 42.

[24]  20 C.F.R. Part 404, App. 1, Subpart P, 12.05C.

was under the age of 22 but instead when she was 53 years old; and (2) the examiner

questioned the validity of these scores. Specifically, Dr. Tozzo-Julian noted that due to

Plaintiff's history of learning disabilities, Plaintiff's perceptual reasoning index

score–73–was "the best measure of her overall intelligence." Building on this

conclusion, Dr. Tozzo-Julian opined that Plaintiff had functioning in the borderline range

of intelligence. (R. 485.)

However, even if the scores were to be considered valid, IQ alone is not

enough to determine mental retardation because "[i]mpairments in adaptive functioning,

rather than low IQ, are usually the presenting symptoms in individuals with Mental

Retardation."[25] While the IQ often remains stable, adaptive function can improve with

training,[26] and therefore a valid IQ score is not enough to determine if someone is

mentally retarded.[27] Accordingly, the primary issue is whether Plaintiff has the requisite

deficits in adaptive functioning to meet the requirements of Listings 12.05B and 12.05C.

In the instant case, the ALJ's conclusion that Plaintiff does not meet the

requirements of Listing 12.05B or 12.05C is supported by substantial evidence.

Specifically, despite Plaintiff's questionable low IQ scores and additional severe

impairments, she does not meet Listing 12.05 B or 12.05C because the evidence does

---

[25] DSM-IV at 42.

[26] Id.

[27] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

not show the required deficits in adaptive functioning.  The medical evidence and

Plaintiff's activities of daily living supports the ALJ's finding.  Notably, Plaintiff has a

lengthy prior work history as a cashier, sewing machine operator, CNA, and desk clerk.

She left her last job either because she was laid off for not having the required

education (per her testimony at the hearing), an illness (hearing testimony), or because

she left to become a housewife (per her disability report).  (R. 16, 145.)  The substantial

evidence of record further demonstrates that Plaintiff can read and write, make change,

drives, and has not only been able to care for herself but care for others.  She is able to

shop, clean, and sometimes visit with others.  She has been married four times and has

adult children.  She completed the ninth grade but left school to have her first child.

She has a driver's license and passed a CNA test.  Consultative psychologist Dr.

Tozzo-Julian specifically diagnosed borderline intellectual functioning, not mental

retardation.  All of this evidence fully supports the conclusion that Plaintiff did not suffer

from the required deficits in adaptive functioning.

Accordingly, the Court concludes that the ALJ did not err in  finding that Plaintiff

did not meet the requirements of Listing 12.05B or 12.05C because Plaintiff failed to

demonstrate that she had the required deficits in adaptive functioning.

## V.  <u>RECOMMENDATION</u>

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on December 4, 2012.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.